IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| W. CAPRA CONSULTING GROUP, INC. | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) | |
| QUINTON SNYDER | ) ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**[1]

---

[1] Plaintiff reserves the right to supplement its Motion and this Memorandum before or after the Court conducts a hearing on Plaintiff's request for a preliminary injunction to address any additional evidence discovered after the filing of the Motion and Memorandum.

**INTRODUCTION**

W. Capra Consulting Group, Inc. ("W. Capra") is an industry leader in providing IT and business focused advisory and professional services in data security, payments and retail technology. (Declaration of Nick Stavropoulus, ¶ 3, attached as Exhibit A). In December, 2017, W. Capra hired Defendant Quinton Snyder ("Snyder") as a Senior Security Engineer. (Id. ¶4). In this capacity, Snyder was responsible for providing product consulting and security consulting services, including McAfee Endpoint security consultation services. (Id.).

To protect its substantial relationships with its customers, on November 8, 2017, as part of Snyder's employment with W. Capra, Snyder entered into an Employment Agreement ("Employment Agreement"). (Id. ¶7). In exchange for additional consideration of a signing bonus, Snyder agreed to a very limited non-competition provision as part of the Employment Agreement, whereby he agreed not to provide any product consulting or security consulting services for W. Capra's customers for a year after his employment terminated. (Id. ¶8).

Despite the promises Snyder made in the Employment Agreement to not provide similar services to W. Capra's customers after his employment ended, after Snyder resigned from W. Capra on June 14, 2019, he immediately joined McAfee, LLC ("McAfee"), one of W. Capra's key customers for which Snyder was providing services.. (Stavropoulus Decl., ¶10-12). Snyder now serves as a Sales Engineer for McAfee, providing product consulting and security consulting services for McAfee, *the same services Snyder was performing at W. Capra.* (Id. ¶13). (Id). As further explained below, W. Capra is entitled to injunctive relief against Snyder to prevent ongoing violations of the Employment Agreement and substantial harm to W. Capra's relationships with its customers.

1

**BACKGROUND FACTS**

On November 8, 2017, Snyder executed an Employment Agreement with W. Capra whereby he agreed to not provide certain services to W. Capra's customers for whom he had provided services while employed by the company for one year after his employment terminated. (Id. ¶7). In particular, the non-competition provision of the Employment Agreement states:

> **Non-Competition**
> During your employment with W. Capra and for a period of one (1) year immediately following the termination of your employment, regardless of the reason, you will not (except with the express written consent of W. Capra), directly or indirectly, on behalf of yourself or any other entity, either as an employee, contractor, or agent, provide security consulting services, ***including but not limited to McAfee Corporation*** product consulting and/or vulnerability/penetration services, to any customer or other entity to or for which you, on behalf of W. Capra, have provided these services during the last 12 months of your employment with W. Capra.

(Ex. 1 at 2, emphasis added)

During Snyder's employment with W. Capra, he was directly responsible for providing product consulting and security consulting services for its customers, including McAfee Endpoint security consultation services. (Stavropoulus Decl., ¶6). During Snyder's last twelve months of employment with W. Capra, Snyder provided product consulting and security consulting services to W. Capra's customer, McAfee, pursuant to, among other things, a statement of work between W. Capra and McAfee, dated April 30, 2019 for McAfee's customer LifePoint. (Id. ¶11). The statement of work related to the LifePoint project called for W. Capra to receive $249,000 for its services. (Id.).

Under that Statement of Work, and otherwise as a Senior Security Engineer for W. Capra, Snyder provided product consulting and security services, including:

- Analyzing and documenting client requirements and complete solution designs showing how McAfee products can meet the clients' needs;

- Conducting requirements analysis and solution architecture for integrated network, data and personal computer solutions as it relates to McAfee;

- Providing SME(Subject Matter Expert) knowledge on information governance and data protection within McAfee;

- Designing, architecting and deploying all McAfee security products;

- Planning, managing and executing McAfee customer product pilots;

- Demonstrating technical proficiency in myriad McAfee Endpoint and Network products;

- Providing knowledge transfer to customer staff for deployed McAfee products;

- Providing product demonstrations of McAfee security software for current McAfee customers to expand product footprint;

- Working with the McAfee sales team to position McAfee's products favorably and to increase deployed solutions within current customer base;

- Performing on-site product demonstrations and PoC for all McAfee products;

- Participating in strategic meetings with McAfee's account team (Sales and Professional Services) to discuss current customer challenges, how to overcome those challenges, and position McAfee favorably;

- Writing technical documentation and lead briefings; and

- Providing mitigation strategies for various cyber threats.

(Id. ¶6).

Snyder submitted his resignation to W. Capra on June 4, 2019, with his last day of employment to be June 14, 2019. (Id. ¶10). Despite Snyder's express contractual agreement to the contrary, after leaving W. Capra Snyder immediately began employment at W. Capra's customer McAfee as a Sales Engineer. (Id. ¶12). As a Sales Engineer for McAfee, Snyder will be performing product consulting and security consulting services, including but not limited to:

- Working "as a subject-matter expert to demonstrate how a proposed [McAfee] solution meets and exceeds customer requirements;"

3

- "Participat[ing] in conference calls and customer prospect visits, providing [McAfee] product demonstrations in person and via WebEx;"

- "Plan[ning], manag[ing] and execut[ing] [McAfee] customer product pilots;"

- "Work[ing] with the [McAfee] sales team to strategize on sales approaches to develop business;"

- "Ensur[ing] successful on-site [McAfee] product evaluations and post-sale installations when necessary;"

- "Manag[ing] the Regional Strategic Account customer base on their technical needs;" and

- "Participat[ing] as a technical resource at trade shows and conferences, when needed."

(Ex. 2, McAfee Job Posting for a Sales Engineer)

W. Capra engaged in a good faith attempt to resolve this dispute with Snyder prior to filing this action. Upon learning of Snyder's possible employment with McAfee, on June 12, 2019, W. Capra's counsel sent Snyder a letter to notify him of his continuing obligations under the Employment Agreement demanding he abide by the non-competition provision and provide written assurance to W. Capra that he will not work for McAfee. (Id. ¶14). Snyder refused to do so and he remains employed by McAfee in direct violation of the non-competition. (Id. ¶15).

Snyder's refusal to comply with the non-competition provision of his Employment Agreement will cause the W. Capra to lose significant revenue and profits. McAfee has already notified W. Capra that it is terminating the statement of work related to LifePoint, which still has a remaining value of $147,000. (Id. ¶16). Snyder's provision of product consulting and security consulting services for McAfee is in direct competition with W. Capra's provision of product

4

consulting and security consulting services for McAfee. (Id.). Contracts that McAfee could have awarded to W. Capra can instead be assigned to Snyder. (Id.).

## LEGAL STANDARD

A temporary restraining order is an emergency remedy issued to maintain the status quo until a hearing can be held on an application for a preliminary injunction. When deciding whether to issue a TRO, courts apply the same standard that applies to a motion for a preliminary injunction. *Bernina of Am., Inc. v. Fashion Fabrics Int'l, Inc.*, No. 01 C 585, 2001 WL 128164, at *1 (N.D. Ill. Feb. 9, 2001) ("The standards for a temporary restraining order and a preliminary injunction are identical.")[2]; *Gucci Am., Inc. v. Heng Ke*, No. 11-23998-CIV, 2011 WL 13224901, at *2 (S.D. Fla. Nov. 29, 2011) ("The standard for determining whether to issue a preliminary injunction is encompassed in the standard for issuing a temporary restraining order."). To determine whether preliminary injunctive relief is warranted, the court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase. In the threshold phase, the court must determine whether the party seeking the preliminary injunction has demonstrated that: (1) absent preliminary injunctive relief, it will suffer irreparable harm in the interim prior to resolution; (2) there is no adequate remedy at law; and (3) it has a reasonable likelihood of success on the merits. *Turnell v. Centimark Corp.*, 796 F. 3d 656, 661-62 (7th Cir. 2015) (citing *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of USA, Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008)); *See also Tropical Fruit Trading, Inc. v. AgroFarms, LLC*, No. 16-CV-21735, 2016 WL 4376747, at *2 (S.D. Fla. Aug. 17, 2016). No single factor is determinative; instead, the factors must be balanced on the whole. *Girl Scouts*, 549 F.3d at 1086; *Devereaux v. Colvin*, 844 F. Supp. 1508, 1509 (M.D. Fla. 1994).

---

[2] Whether Illinois or Florida law applies to the Employment Agreement, the legal standards for W. Capra being entitled to a temporary restraining order and preliminary injunction are met.

Once the movant makes the required threshold showing the court considers: (a) the irreparable harm that the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (b) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (i.e., the "public interest"). *Turnell*, 796 F. 3d at 662; *Girl Scouts*, 549 F.3d at 1086. *see also Qantum Commc'ns Corp. v. Star Broad., Inc.*, 382 F. Supp. 2d 1362, 1365 (S.D. Fla. 2005).

## ARGUMENT

**I.   W. Capra Will Suffer Irreparable Harm Unless a Temporary Restraining Order and Preliminary Injunction are Issued.**

*First,* it is clear in this case that the W. Capra will suffer irreparable harm if, during the pendency of this litigation, Snyder is allowed to provide competing product consulting and security consulting services to W. Capra's customer, McAfee, satisfying the first prong in the threshold phase analysis. Temporary restraining orders and preliminary injunctions are warranted to prevent irreparable injury and to maintain the status quo. *American Can Co. v. Mansukhani*, 742 F.2 314, 321-22 (7th Cir. 1984); *C.H. Robinson Co. v. Worldwide Produce & Groceries, LLC*, No. 10-23760-CIV, 2010 WL 11597199, at *1 (S.D. Fla. Oct. 25, 2010) ("A temporary restraining order is used primarily for maintaining the status quo of the parties.").

Plaintiffs need not demonstrate concrete harm or specific injuries as "it is precisely the difficulty in pinning down what business has been lost or will be lost that makes an injury 'irreparable'". *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005). ); *see also Urologix, Inc. v. Wood*, No. 808-CV-669-T-30MAP, 2008 WL 2790230, at *8 (M.D. Fla. July 18, 2008) (stating that loss of business "may constitute irreparable injury where, as here, the amount of lost profits is difficult or impossible to calculate," and loss of customers and goodwill may constitute irreparable injury). A plaintiff suffers irreparable harm from damages

6

that are very difficult to calculate, or are difficult to prove and quantify. *Turnell*, 796 F.3d at 666; *Urologix, Inc.*, WL 2790230, at *8; *Schwend, Inc. v. Cook*, No. 8:05-CV-458-T-24TGW, 2005 WL 8160323, at *7 (M.D. Fla. June 6, 2005) ("In light of the evidence demonstrating that the plaintiff has lost business…the defendants cannot rebut that presumption [of irreparable harm]."). The Seventh Circuit has long recognized that the "injuries that flow from the violation of a non-compete are difficult to prove and quantify," which "makes restrictive covenants prime candidates for injunctive relief." *Turnell*, 796 F.3d at 666-67; *see also Schwend, Inc.,* 2005 WL 8160323 ("The plaintiff has clearly made a showing of a substantial threat of irreparable injury arising from violations of the non-competition provision of the employment agreement. Under the governing Florida statute, '[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant.'") (quoting Fla. Stat. § 542.335(1)(j)); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Hagerty*, 808 F. Supp. 1555, 1559 (S.D. Fla. 1992) ("[T]he Florida Supreme Court has held repeatedly that where a Defendant has breached a covenant not to compete '[t]he Court may award damages ... but the normal remedy is to grant an injunction. This is so because of the inherently difficult task of determining just what damage is actually caused by the employee's breach of the agreement.'").

   As set forth above, if during the pendency of this litigation Snyder is allowed to provide the same services to McAfee in competition with W. Capra, W. Capra is very likely to lose substantial business from McAfee. If and when McAfee opts to assign such services to Snyder, as an employee, it will be much harder – if not impossible – to reclaim that business for W. Capra and recover that goodwill. This is the exact type of damages and harm that courts have found to be difficult to prove and quantify, thus making them irreparable. For these reasons, W.

Capra will suffer irreparable harm if the Court does not impose injunctive relief to enforce the terms of the Employment Agreement during the pendency of this litigation.

## II.     W. Capra Has No Adequate Remedy at Law.

*Second*, W. Capra has no adequate remedy at law because the precise nature and extent of the damages caused by Snyder's violation of the Employment Agreement is nearly impossible to measure. *Girl Scouts*, 549 F.3d at 1086; *Roland Machinery Co.*, 749 F.2d at 386; *Atomic Tattoos, LLC v. Morgan*, 45 So. 3d 63, 66 (Fla. Dist. Ct. App. 2010) (Reversing denial of temporary injunctive relief and stating "[m]onetary damages would be difficult to determine because the number of sales lost, as well as any potential profit, would be nearly impossible to calculate, particularly with a continuing breach [of covenant not to compete]."). W. Capra would not be able to measure how much business McAfee would have otherwise awarded to W. Capra absent the employment of Snyder, versus variations in McAfee's awarding of work to W. Capra for other reasons. Even if such opportunities could be measured at the present time, there is no way to forecast the future harm incurred due to the weakening of W. Capra's substantial relationship with McAfee. For this reason, courts recognize that where there is a threatened breach of a restrictive covenant injunctive relief is the appropriate remedy. *JAK Prods., Inc. v. Wiza*, 986 F.2d 1080, 1084 (7th Cir. 1993); *see also Hagerty*, 808 F. Supp. at 1559 (stating that injunctive relief is the normal remedy for breaches of covenants not to compete). As there is no reliable means to measure the impact of this potential harm posed by Snyder's actions, it is both irreparable and incapable of being cured through legal remedies.

## III.    W. Capra Has a Reasonable Likelihood of Success on the Merits.

*Third*, W. Capra is reasonably likely to prevail on its breach of contract claim against Snyder for violating the Employment Agreements. To establish the likelihood of success, W. Capra must simply show it has a better than negligible chance of succeeding on the merits. *Girl*

8

*Scouts*, 549 F.3d at 1096. This is an "admittedly low requirement and is simply a threshold question." *Id.*, *Brunswick Corp. v. Jones*, 784 F.2d 271, 275 (7th Cir. 1986) (quoting *Omega Satellite Prod. Co. v. City of Indianapolis*, 694 F.2d 119, 123 (7th Cir. 1982)) ("Although the plaintiff must demonstrate some probability of success on the merits, the threshold is low. It is enough that 'the plaintiff's chances are better than negligible...'"). *See also, Centennial Bank v. ServisFirst Bank Inc.*, No. 8:16-CV-88-T-36JSS, 2016 WL 7325545, at *5 (M.D. Fla. May 17, 2016) ("A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success.").

### 1. The Agreement is Necessary to Protect W. Capra's Legitimate Business Interests

W. Capra has legitimate, protectable interests in its business goodwill and in preventing Snyder from harming W. Capra's substantial relationships with its customers. *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) ("[S]hould Defendants be allowed to continue to pilfer Diamond Blade's customers and employees, Diamond Blade will lose *goodwill*, competitive position, and *continuity of business relationships with its customers* and employees. Such harm is oftentimes fatal to businesses, and cannot be readily calculated and cured by an award of monetary damages. The harm that Diamond Blade would suffer should no injunction issue outweighs the harm to Defendants should the injunction issue…The court therefore determines that injunctive relief in favor of Diamond Blade is appropriate in this case.") (emphasis added); Fla. Stat. § 542.335(1)(b) (defining legitimate business interests to include, *inter alia*, goodwill and substantial relationships with customers or clients); *Winmark Corp. v. Brenoby Sports, Inc.*, 32 F. Supp. 3d 1206, 1219 (S.D. Fla. 2014) (stating that customer goodwill and existing franchise relationships constituted legitimate business interests); *PartyLite Gifts, Inc. v. MacMillan*, 895 F. Supp. 2d

9

1213, 1224 (M.D. Fla. 2012) (stating that legitimate business interests include, *inter alia*, substantial relationships with prospective or existing customers or clients and customer goodwill).

The non-competition provision of the Employment Agreement is extremely limited and merely protects W. Capra from Snyder going to one of W. Capra's customers and providing that customer the same or similar services that he and W. Capra provided that customer, for a one year period. This restriction is vital to W. Capra's ability to maintain its relationships with its customers, including McAfee. W. Capra's desire to protect against this harm to its customer relationships is eminently reasonable and appropriate, and the provision contained in the Employment Agreement is necessary to protect that legitimate business interest. Snyder is free to join any other entity, including W. Capra's direct competitors. He is only prohibited from joining W. Capra's customers, such as McAfee, for one year after his employment terminates.

### 2. The Agreement is Reasonable in Scope

The Employment Agreement limits Snyder's competition with W. Capra for one following the termination of his employment. Under Illinois and Florida law, courts have repeatedly held that a one-year limitation is reasonable and enforceable. *See, e.g., Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, No. 02 C 5403, 2003 WL 1057929, at *20 (N.D. Ill. Mar. 10, 2003) ("Non-compete agreements lasting for one year (or even more) have been upheld") (citing cases); *Autonation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1308 (S.D. Fla. 2004); *Medi-Weightloss Franchising USA, LLC v. Medi-Weightloss Clinic of Boca Raton, LLC*, No. 8:11-CV-2437-T-30MAP, 2012 WL 260902, at *5 (M.D. Fla. Jan. 3, 2012) ("In Florida, two year terms have been found reasonable…Thus the restrictive covenants are reasonable in time."); *see also* Fla. Stat. § 542.335(1)(d) ("a court shall presume reasonable in time any restraint 6

10

months or less in duration and shall presume unreasonable in time any restraint more than 2 years in duration")

The non-competition provision is also reasonable in its scope, as it is narrowly limited to only those customers Snyder was responsible for as W. Capra's Senior Security Engineer. *See, e.g., Samuel Bingham Co. v. Maron*, 651 F. Supp. 102, 105 (N.D. Ill. 1986) ("For example, activity restrictions reasonably related to the former employer's interest in protecting its customer relations, typically restrictions against the former employee soliciting certain customers or using customer lists, do not necessarily require geographic limitations."); *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1057 (1st Dist. 1985) ("Defendants are only restricted from selling to certain McRand customers. The rest of the field remains open to them for competition with McRand or any other company. Thus, we find that no undue hardship will be suffered by defendants upon issuance of the requested injunctive relief."); *Telxon Corp. v. Hoffman*, 720 F. Supp. 657, 663 (N.D. Ill. 1989) ("As such, activity restrictions reasonably related to the former employer's interest in protecting its customer relations, typically restrictions against the solicitation of certain customers or using customer lists, do not necessarily require geographic limitations."); *Maximum Indep. Brokerage, LLC v. Smith*, 218 F. Supp. 3d 630, 638 (N.D. Ill. 2016) ("Maximum argues that a geographical limitation is not necessary if the restrictive covenant only prohibits the employee from engaging in certain activities, such as soliciting his or her former employer's customers…The agreement states that within two years, the employee shall not call upon, solicit, negotiate, arrange, provide or sell insurance or insurance-related products of any kind…Maximum has shown that the non-solicitation clause is qualified by a reasonable activity restraint."); *Envtl. Servs., Inc. v. Carter*, 9 So. 3d 1258, 1264 (Fla. Dist. Ct. App. 2009)

11

("Decisional law demonstrates that a relatively narrow restriction, such as the one here [which prohibits the solicitation of business from or performance of services for any current, former or prospective customers of the company with whom the employee had any business-related contact during his or her employment with the company], is not invalid because it fails to contain a geographic limitation."); *Sentry Ins. Co. v. Dunn,* 411 So.2d 336, 337 (Fla. 5th DCA 1982) ("No area limitation problem exists since the agreement merely prohibits Dunn from soliciting, quoting rates, etc. for customers he served while at Sentry. Dunn remains free to write insurance and serve any other customers.").

## IV. The Threatened Injury to W. Capra Far Outweighs Potential Harm to Snyder by the Requested Injunctive Relief.

The standard for granting injunctive relief and enforcing a restrictive covenant considers the impact of the requested relief on the Plaintiff and the Defendant. The analysis in each instance asks the Court to balance the potential harm to the Plaintiff of denying the relief compared to the harm to Defendant from granting the relief. Here, the balance of the harms strongly favors W. Capra. The threatened harm to W. Capra through Snyder's violation of his non-competition agreement – irreparable harm to W. Capra's substantial business relationship with McAfee – is substantial and greatly outweighs any potential harm to Snyder.

The requested relief does nothing more than maintain the status quo prior to hiring Snyder. *See Turnell*, 796 F.3d at 666 (ex-employee potential loss of income due to restrictive covenants was not irreparable and accordingly was outweighed by former employer's potential irreparable harm); *Atomic Tattoos, LLC*, 45 So. 3d at 66 ("In determining the enforceability of a restrictive covenant, a court ... [s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought.") (citing Fla. Stat. § 542.335(1)(g)(1)). W. Capra does not seek to prohibit from any employment of Snyder by

12

McAfee, only to enjoin him from performing the same or similar duties for McAfee as he did for W. Capra, including any McAfee product consulting or security consulting services. Nor does W. Capra seek to prevent Snyder from working for any of its competitors.

On the other hand, denying the Motion will have a significant and detrimental impact on W. Capra. As explained above, W. Capra risks harming its substantial business relationship with its customer, McAfee, which cannot be readily recovered once lost. *Turnell*, 796 F.3d at 666-67 (loss of customer relationships "is a canonical form of irreparable harm"); *New Horizons Computer Learning Ctr., Inc. v. Silicon Valley Training Partners, Inc.*, No. 2:02CV495FTM29SPC, 2003 WL 23654790, *7 (M.D. Fla. Nov. 12, 2013) ("When the failure to grant injunctive relief creates the possibility of a permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong has been satisfied."); *Atomic Tattoos, LLC*, 45 So. 3d at 66; *Osborne Assocs., Inc. v. Cangemi*, No. 3:17-CV-1135-J-34MCR, 2017 WL 5443146, at *14 (M.D. Fla. Nov. 14, 2017) ("Moreover, the purpose of Florida's rebuttable presumption of irreparable harm is to ensure that an employer, like Generations Salon, does not have to wait until it has been harmed by the loss of a specific customer in order to obtain an injunction. Indeed, such a showing would place Generations Salon in a position of actually having to suffer damages that would be difficult to measure with reasonable certainty."). This is precisely the reason W. Capra asked Snyder to enter into the non-competition provision in the Employment Agreement as a condition to becoming an employee of W. Capra.

Given the critical and irreparable harm to W. Capra as compared to the minimal harm to Snyder, this factor favors granting injunctive relief. However, even if the Court somehow considered the balance of the harms to be more equal or even perceived the harm to Snyder as being greater, that would not pose a barrier to granting Plaintiff's Motion. Where the movant has

13

established a strong likelihood of success on its claims, the balancing test becomes far less relevant. *Storck USA, LP v. Farley Candy Co.*, 14 F.3d 311, (7th Cir. 1994) ("The balancing involves a "sliding scale" analysis: the greater the movant's chance of success on the merits, the less strong a showing must it make that the balance of harms is in its favor."); *Cordis Corp. v. Prooslin*, 482 So. 2d 486, 491 (Fla. Dist. Ct. App. 1986) ("The trial court must use a balancing-type approach, balancing the possible beneficial results on the one hand with the possible detrimental results on the other…and the threatened hardships associated with the issuance or denial of the injunction with the degree of likelihood of success on the merits.") (citations omitted); *Int'l Hair & Beauty Sys., LLC v. Simply Organic, Inc.*, No. 8:11-CV-1883-30AEP, 2011 WL 5359264, at *7 (M.D. Fla. Sept. 26, 2011) (stating that "in cases where the balance of the equities weighs heavily in favor of granting the [injunction], the movant need only show a substantial [rather than likely] case on the merits.") (citations and quotations omitted) (first alteration in original). For the reasons detailed herein, W. Capra has a high likelihood of succeeding on its claim. Thus, the balance of the harms has a reduced significance in the present case.

V.      **Injunctive Relief is Not Contrary to the Public Interest.**

Granting a temporary and preliminary injunction here also serves the public interest. An injunction often protects a company's substantial relationships with its customers. The public interest is served by recognizing the importance of economic interests of companies such as W. Capra by ensuring that parties abide by agreements that they voluntarily enter into for valuable consideration. *See, e.g., Turnell,* 2014 WL 3396490 at *5 (finding that preliminary injunction was consistent with public interest in enforcing contracts); *Int'l Hair & Beauty Sys., LLC*, WL 5359264, at *9 ("Here, a preliminary injunction would affirmatively serve the public interest by [*inter alia*] preserving faith in the contractual agreements that businesses routinely make with

14

their employees, by upholding the terms of enforceable contracts…"); *Pirtek USA, LLC v. Twillman*, No. 616CV01302ORL37TBS, 2016 WL 5846978, at *9 (M.D. Fla. Oct. 6, 2016) ("Here, preliminary injunctive relief would serve the public interest by promoting stability of business relations and reliability of contracts."); *see also* Fla. Stat § 542.335(1)(i) (a court's refusal to enforce requires the court to articulate how and why public policy outstrips the protection of legitimate business interests sought by the party seeking enforcement). Here, the public interest is served by preventing Snyder from violating the terms of the Employment Agreement he specifically agreed to. Accordingly, the public interest favors both enforcement of the Employment Agreement and the granting of injunctive relief.

## CONCLUSION

For all the reasons stated herein, the Court should grant Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction and prohibit Snyder for a period of one year from working directly or indirectly, on behalf of himself or any other entity, either as an employee, contractor, or agent, to provide security consulting services, including but not limited to McAfee Corporation product consulting and/or vulnerability/penetration services, to any customer or other entity to or for which he, on behalf of W. Capra, had provided these services during the last twelve months of Snyder's employment with W. Capra, including McAfee.

15

**W. CAPRA CONSULTING GROUP, INC.**


By: _/s/ Martin B. Carroll_____
One of its Attorneys

Martin B. Carroll (ARDC # 6200977)
mcarroll@foxswibel.com
Jason J. Keener (ARDC # 6280337)
jkeener@foxswibel.com
**Fox Swibel Levin & Carroll LLP**
200 W. Madison St., Suite 3000
Chicago, IL 60606
(312) 224-1200

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2019, the above Memorandum in Support of its Motion for Temporary Restraining Order and Preliminary Injunction is being served upon Defendant Quinton Snyder via email and by hand delivery through a process server.

*/s/ __Jamie Neagle_____*
Jamie Neagle