# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

W. CAPRA CONSULTING GROUP, INC.  )
                                     )
      Plaintiff,                )
                                     )     No. 1:19 C 4188
      v.                        )     Hon. Marvin E. Aspen
                                     )
QUINTON SNYDER,           )
                                     )
      Defendant.           )

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Presently before us is Plaintiff W. Capra Consulting Group, Inc.'s ("W. Capra") motion for a temporary restraining order ("TRO") and preliminary injunction against Defendant Quinton Snyder for allegedly breaching the non-competition clause in an employment contract. (Verified Compl. (Dkt. No. 1); Mot. for TRO (Dkt. No. 5).) Snyder has moved to dismiss W. Capra's complaint for lack of personal jurisdiction pursuant to Federal Rule 12(b)(2). (Mot. to Dismiss (Dkt. No. 16).) For the following reasons, we find that we have personal jurisdiction over Snyder and deny his Rule 12(b)(2) motion, and we grant W. Capra's motion for a temporary restraining order and preliminary injunction.

## BACKGROUND

The following facts are taken from W. Capra's verified complaint; declarations of Nick Stavropoulos, W. Capra's Security Practice Director and Snyder's former supervisor; Snyder's affidavits; and attached exhibits submitted by the parties. For those facts related to W. Capra's TRO and preliminary injunction motion, we "must make factual determinations on the basis of a fair interpretation of the evidence before the court." *Darryl H. v. Coler*, 801 F.2d 893, 898

(7th Cir. 1986). However, these findings are preliminary and "do not bind the district court as the case progresses." *Mich. v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011). In deciding Snyder's motion to dismiss for lack of personal jurisdiction, which is based on the parties' submission of written materials without holding an evidentiary hearing, the plaintiff must make a *prima facie* case of personal jurisdiction, and we resolve all factual disputes pertaining to jurisdiction in the plaintiff's favor. *GCIU–Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009); *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003).

### A. Facts Pertaining to TRO and Preliminary Injunction Motion

W. Capra is an Illinois corporation that provides information technology and professional services in data security, payments, and retail technology. (Verified Compl. ¶ 1.) Snyder is a Florida citizen who was employed by W. Capra as a Senior Security Engineer from December 2017 until June 14, 2019. (*Id.* ¶ 2.)

A subset of W. Capra's larger practice includes a specialized team devoted to providing consulting services on computer network security products produced by McAfee, LLC ("McAfee"). (*Id.* ¶ 6.) In addition to serving businesses that use McAfee products, McAfee also engages W. Capra directly by licensing its products to end-users and contracting with W. Capra to provide product and security consulting services to those end-users. (*Id.* ¶¶ 6–7; Stavropoulos Suppl. TRO Decl. (Dkt. No. 19–1) ¶ 5.) Snyder was responsible for performing various McAfee-centric consulting tasks for W. Capra clients, including "[a]nalyzing and documenting client requirements and complete solution designs showing how McAfee products can meet the clients' needs; . . . [p]roviding [expert] knowledge on information governance and data protection within McAfee; [d]esigning, architecting and deploying all McAfee security products; [and] [w]orking with the McAfee sales team to position McAfee's products favorably"

with clients. (*Id.* ¶ 8.) Snyder served W. Capra customers that used McAfee products, including McAfee end-users pursuant to agreements between McAfee and W. Capra. (Verified Compl. ¶ 7.) Within a year of his exit from W. Capra, Snyder provided product and security consulting services to a McAfee client named LifePoint pursuant to a statement of work between McAfee and W. Capra dated April 30, 2019. (*Id.* ¶ 13; Stavropoulos TRO Decl. (Dkt. No. 6–1) ¶¶ 4, 11, 16; Stavropoulos Suppl. TRO Decl. ¶ 6.)

When Snyder joined W. Capra, he signed an employment agreement that included a restrictive non-competition covenant, which reads as follows:

> During your employment with W. Capra and for a period of one (1) year immediately following the termination of your employment, regardless of the reason, you will not (except with the express prior written consent of W. Capra), directly or indirectly, on behalf of yourself or any other entity, either as an employee, contractor, or agent, provide security consulting services, including but not limited to McAfee Corporation product consulting and/or vulnerability/penetration services, to any customer or other entity to or for which you, on behalf of W. Capra, have provided these services during the last 12 months of your employment with W. Capra.

(*Id.* ¶ 10; Employment Agreement (Dkt. No. 6–2) at 3.) The employment agreement states that the non-competition clause is "in consideration of [Snyder's] employment by W. Capra and a sign on bonus in the amount of $1,000.00." (*Id.*)

Snyder resigned from W. Capra on June 4, 2019, and his last day of employment with the company was June 14, 2019. (Verified Compl. ¶ 12.) Snyder immediately took a position as a Sales Engineer with McAfee, beginning on June 17, 2019. (*Id.* ¶ 14.) After hiring Snyder, McAfee informed W. Capra that it would be canceling the statement of work, which had $147,000 worth of work still to be performed. (*Id.* ¶ 15.) A letter from McAfee's employment counsel, dated June 25, 2019, states that "McAfee has not provided W[.] Capra with notice that McAfee plans to cancel the [statement of work] for LifePoint." (Snyder Aff. (Dkt. No. 14–1) at 13 (letter from McAfee Global Lead Labor and Employment Counsel).) After filing its suit

against Snyder, W. Capra reentered negotiations with McAfee to save the LifePoint contract and to reassign a new W. Capra employee to LifePoint, although it is unclear whether the contract presently remains in force. (Stavropoulos Suppl. TRO Decl. ¶ 7.)

Snyder's new position with McAfee involves working with other sales team members to create "solution architecture and proposals that meets or exceeds the customer's requirements." (Snyder Aff. at 9 (attaching copy of Sales Engineer job description).) The position, housed in the McAfee Pre-Sales Organization, is responsible for, among other things, assessing customer requirements, creating proposals that meet customer needs, "deliver[ing] a comprehensive consultative response" to requests for proposals, demonstrating McAfee solutions to customers, and when required, "lead[ing] the proof of concept from engagement, ownership of all activities and orchestration, through to completion." (*Id.*) W. Capra has submitted a detailed chart of Snyder's new duties at McAfee that overlap with those functions he performed at W. Capra concerning McAfee products and services. (Stavropoulos Suppl. TRO Decl. ¶ 11.)

W. Capra's counsel notified Snyder of its belief that he was in violation of his non-competition agreement. (Verified Compl. ¶ 17.) After Snyder failed to reassure W. Capra that he was in compliance, W. Capra filed this lawsuit on June 21, 2019 along with the present motion for TRO and preliminary injunction. (*Id.* ¶ 18; Mot. for TRO.)

### B. Facts Pertaining to Personal Jurisdiction

In support of our jurisdiction, W. Capra submits a declaration of Snyder's former manager, Nick Stavropoulos. ("Pl.'s PJ Resp." (Dkt. No. 20); "Stavropoulos PJ Decl." (Dkt. No. 20–1).) Snyder submits his own affidavits that challenge many of the factual assertions in Stavropoulos's declaration. ("Snyder PJ Aff." (Dkt. No. 16–2); "Snyder Suppl. PJ Aff." (Dkt. No. 25).) As we resolve all factual disputes in the plaintiff's favor, *Purdue*, 338 F.3d at 782, we take the relevant jurisdictional facts from Stavropoulos's declaration and

Snyder's affidavits, but resolve any factual disputes among the parties' submissions in W. Capra's favor.

W. Capra, an Illinois company, posted a job listing for a Senior Security Engineer in 2017. (Stavropoulos PJ Decl. ¶ 5.) The online job aggregator Glassdoor "scraped" the listing and posted it on its own site. (*Id.*) Snyder, from his home in Florida, submitted his resume for the Senior Security Engineer position through Glassdoor to W. Capra. (*Id.* ¶ 6; Snyder PJ Aff. ¶ 6.)

Snyder participated in a series of phone interviews from Florida with five W. Capra personnel located in Illinois during the hiring process. (Stavropoulos PJ Decl. ¶ 7.) These calls included an initial screening, a technical assessment, interviews with Stavropoulos as Snyder's potential direct supervisor and with a W. Capra partner to make the final hiring determination, and a follow-up conversation with W. Capra's Operations and HR Manager to discuss hiring logistics and to present the terms of the employment contract. (*Id.*) Most of these calls were initiated by W. Capra personnel. (Snyder PJ Aff. ¶¶ 7, 11.) The discussions indicated that Snyder would work from Florida, that he would visit customers at their (non-Illinois) locations, and that he did not have to come to Illinois to conduct business on behalf of W. Capra. (*Id.* ¶¶ 8–10.) Snyder reviewed and executed the offer of employment from Florida, using W. Capra's HR Manager's Illinois-linked online signature account. (*Id.* ¶ 13; Stavropoulos PJ Decl. ¶ 8.) The contract included the non-competition covenant that is the subject of this dispute. (*See* Employment Agreement at 3.)

Snyder worked for W. Capra from December 2017 through June 14, 2019. (Snyder PJ Aff. ¶ 15.) He performed consulting work for various end-users of McAfee computer security products in several non-Illinois states. (Stavropoulos PJ Decl. ¶ 10 (detailing temporary worksites in eight states).) Snyder communicated with his supervisor and W. Capra support

personnel in Illinois before and during each customer engagement.  (*Id.* ¶ 12.)  These communications included an overview of each project with Stavropoulos, preparations with W. Capra's Technical Lead, and travel logistics with W. Capra's Account and Finance Department.  (*Id.*)  Snyder communicated as needed with each of these personnel and W. Capra's Illinois-based Security Practice Owner during each engagement.  (*Id.* ¶ 13.)  Snyder also submitted weekly timesheets and expense reports to W. Capra personnel in Illinois.  (*Id.* ¶ 14.)[1]

Snyder traveled to Illinois two times during his employment to attend W. Capra holiday parties in 2017 and 2018.  (*Id.* ¶ 11; Snyder PJ Aff. ¶ 16.)  Snyder asserts that no work was conducted at these parties, which were "purely voluntary social engagements."  (Snyder Suppl. PJ Aff. ¶ 9.)

Snyder maintained multiple links to Illinois-based personnel at W. Capra via phone and computer.  Snyder conducted more than 80 phone calls totaling more than 600 minutes and exchanged hundreds of emails with W. Capra personnel in Illinois.  (Stavropoulos PJ Decl. ¶ 17.)[2]  Snyder participated at least periodically in phone-based security team meetings administered by Stavropoulos in Illinois.  (Stavropoulos PJ Decl. ¶ 16; Snyder Suppl. PJ Aff. ¶ 15.)  (These meetings ceased in mid-2018, and Snyder represents that he did not call into them most of the time because he was either traveling or meeting with clients.  (Snyder Suppl. PJ Aff. ¶¶ 15–16.))  Snyder also received remote access to W. Capra computers hosted in Illinois,

---

[1] Snyder asserts that the timesheets and expense reports were submitted through online portals owned by New York- and Boston-based companies, respectively, and not to W. Capra directly. (Def.'s Suppl. PJ Aff. ¶¶ 12–13.)  He does not dispute, however, that he was submitting these materials with the intention that they be received by W. Capra in Illinois.

[2] Snyder faults W. Capra for not producing call logs or the actual emails and claims that most of the calls were between a non-Illinois customer and himself.  (Def.'s Suppl. PJ Aff. ¶ 18.)  However, Stavropoulos states that the calls and emails occurred with Illinois individuals, and at this stage, we resolve factual disputes in W. Capra's favor.  *Purdue*, 338 F.3d at 782.

but Snyder disputes that he ever used this system because he set up and used his own system in Florida.  (Stavropoulos PJ Decl. ¶ 15; Snyder Suppl. PJ Aff. ¶ 14.)

## I.  MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Snyder moves to dismiss under Rule 12(b)(2), which calls for dismissal where we lack personal jurisdiction over a party.  Fed. R. Civ. P. 12(b)(2).  (Mot. to Dismiss.)  For the reasons that follow, we conclude that this Court has personal jurisdiction over Snyder and deny his motion to dismiss.

### A.  LEGAL STANDARD

Although a plaintiff need not anticipate a personal jurisdiction challenge in its complaint, once the defendant moves to dismiss the complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.  *Purdue*, 338 F.3d at 782.  "A district court sitting in diversity has personal jurisdiction over a nonresident defendant only if a court of the state in which it sits would have jurisdiction."  *Id.* at 779; *see* Fed. R. Civ. P. 4(k)(1)(A).  Illinois' long-arm statute extends the personal jurisdiction of its courts to out-of-state defendants on any basis "permitted by the Illinois Constitution and the Constitution of the United States."  725 ILCS 5/2–209(c).  Therefore, if personal jurisdiction is constitutional, an Illinois court may exercise jurisdiction under its long-arm statute.  *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 492 (7th Cir. 2014) (observing that "the statutory question merges with the constitutional one" in Illinois).

The Due Process Clause of the Fourteenth Amendment sets the bounds of personal jurisdiction in a diversity suit.  U.S. Const., amend. XIV, § 1; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464, 105 S. Ct. 2174, 2177 (1985); *N. Grain Mktg., LLC*, 743 F.3d at 492.  "A forum state's courts may not exercise personal jurisdiction over a nonconsenting, out-of-state defendant unless the defendant has 'certain minimum contacts with it such that the maintenance

of the suit does not offend traditional notions of fair play and substantial justice.'" *N. Grain Mktg.*, 743 F.3d at 492 (quoting *Int'l Shoe Co. v. Wash., Office of Unemp't Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (internal quotations omitted)). The requirement of personal jurisdiction is meant to protect "an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King*, 471 U.S. at 471–72, 105 S. Ct. at 2181 (quoting *Int'l Shoe Co.*, 326 U.S. at 319, 66 S. Ct. at 160). Personal jurisdiction may be general or specific to claims made in a particular case. *Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). General personal jurisdiction arises when a defendant has "continuous and systematic" contacts with a forum state. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S. Ct. 1868, 1873 (1984). W. Capra here claims only that we have specific, rather than general, jurisdiction over Snyder. (Pl.'s PJ Resp. at 1.)

"Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702 (citing *Burger King,* 471 U.S. at 472, 105 S. Ct. at 2182). "The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause." *Id.* (citing *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. at 158). These requirements keep individuals from being called to defend against suits in jurisdictions resulting from purely "random, fortuitous, or attenuated contacts." *Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183. Specific jurisdiction may be appropriate where a defendant "has deliberately engaged in significant activities within the forum state" or "created continuing obligations between itself and a resident of the forum." *Purdue*, 338 F.3d at 780–81.

For cases arising out of contract disputes, "contracting with an out-of-state party alone cannot establish automatically sufficient minimum contacts in the other party's home forum." *Id.* at 781 (citing *Burger King*, 471 U.S. at 478, 105 S. Ct. at 2185). Instead, we must take a "highly realistic" view of the contract in context of the entire transaction between the parties. *Id.* (quoting *Burger King*, 471 U.S. at 479, 105 S. Ct. at 2185). We therefore evaluate the contract's "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing" to determine whether the defendant's actions constitute purposeful minimum contacts with the forum state. *Burger King*, 471 U.S. at 479, 105 S. Ct. at 2185.

## B. ANALYSIS

Applying the foregoing, we conclude that Snyder had sufficient minimum contacts with Illinois through his application, hiring, and employment with W. Capra such that it does not offend "traditional notions of fair play and substantial justice" for him to defend a suit in Illinois arising from an alleged breach of his employment contract. *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. at 158.

### 1. Minimum Contacts

A review of the facts submitted by the parties reveals that Snyder had sufficient minimum contacts with Illinois to render personal jurisdiction proper in an Illinois court.

At the outset, Snyder initiated contact with W. Capra by submitting his resume in response to their job posting. (Stavropoulos PJ Decl. ¶ 6.) "The question of which party initiated or solicited a business transaction has long been considered pertinent to the constitutional propriety of personal jurisdiction in a suit arising out of the transaction." *Madison Consulting Grp. v. State of S.C.*, 752 F.2d 1193, 1202 (7th Cir. 1985). In some cases where courts have found personal jurisdiction, "the defendant's solicitation of the plaintiff amounted to

no more than a single communication that initiated negotiations of the transaction at issue." *Id.* at 1203 (listing cases).

Snyder contends that because he submitted his application via Glassdoor, a non-Illinois third-party job application aggregator, who then forwarded his information to W. Capra, who in turn contacted Snyder, it was in fact W. Capra, not Snyder, who initiated contact. (Mot. to Dismiss ¶¶ 34, 37.) *See Burger King*, 471 U.S. at 475, 105 S. Ct at 2183–84 (personal jurisdiction must be based on the defendant's actions to establish connections with the forum, not on unilateral actions of the plaintiff). We are unconvinced. Snyder did not passively post his resume and wait for any employer to call him. By submitting his resume to W. Capra's Glassdoor listing, Snyder meant for W. Capra to read it and consider Snyder a job applicant. *See, e.g.*, *Felland v. Clifton*, 682 F.3d 665, 676 n.3 (7th Cir. 2012) (although email accounts can be accessed in any state, emails "purposefully sent to Wisconsin residents knowing that they would most likely be read and have their effect in Wisconsin" are "properly considered as contributing to [the defendant's] minimum contacts with the forum state [Wisconsin]").

However, "pinning down which party initiated the transaction is merely one helpful factor in the jurisdictional equation." *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 53 (7th Cir. 1996). Also relevant are the circumstances surrounding Snyder's employment negotiations and ongoing work with W. Capra. *N. Grain Mktg.*, *LLC*, 743 F.3d at 493 (requiring a "context-sensitive" analysis of prior negotiations, future consequences, contract terms, and the parties' course of actual dealing (citing *Purdue*, 338 F.3d at 781)). Snyder participated in a series of interviews with five W. Capra personnel located in Illinois during the hiring process. (Stavropoulos PJ Decl. ¶ 7.) He eventually signed an employment contract with W. Capra, an Illinois company, and worked for them for approximately eighteen months. (*Id.* ¶ 4; Snyder PJ Aff. ¶ 15.) During his employment, Snyder communicated regularly with Illinois-based

personnel for each client to whom Snyder provided service, and he submitted timesheets and expense reports to W. Capra in Illinois. (Stavropoulos PJ Decl. ¶¶ 10, 12–14.) Snyder exchanged more than 80 phone calls and hundreds of emails with W. Capra employees in Illinois, and occasionally participated in Illinois-led meetings by phone. (*Id.* ¶¶ 16–17.)

While isolated phone and email communications may not be sufficient to warrant personal jurisdiction, "[s]ustained contact over the course of several months . . . is 'not random, fortuitous, or attenuated.'" *Abbott Labs., Inc. v. BioValve Techs., Inc.*, 543 F. Supp. 2d 913, 921 (N.D. Ill. 2008) (quoting *Mid-Am. Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1360 (7th Cir. 1996)). "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Burger King*, 471 U.S. at 476, 105 S. Ct. at 2184. Therefore, the many communications between Snyder and W. Capra employees in Illinois alone would likely suffice to subject Snyder to jurisdiction in an Illinois court. Bolstering this conclusion is the fact that Snyder twice traveled to Illinois in connection with his employment to attend work holiday parties. (Stavropoulos PJ Decl. ¶ 11; Snyder PJ Aff. ¶ 16.) Although these may have been "voluntary social engagements," (Snyder Suppl. PJ Aff. ¶ 9), there appears to be no dispute that Snyder would not have attended these functions but for his employment relationship with W. Capra. *See Walden v. Fiore*, 571 U.S. 277, 285, 134 S. Ct. 1115, 1122 (2014) ("physical entry into the [forum] State . . . is certainly a relevant contact").

Finally, Snyder's employment agreement with W. Capra contained the non-competition covenant that forms the subject of the parties' dispute and created "continuing obligations" between Snyder and his former Illinois employer. Snyder thus "manifestly has availed himself of the privilege of conducting business" in Illinois. *Burger King*, 471 U.S. at 476,

105 S. Ct. at 2184; *see also Citadel Grp. Ltd. v. Wash. Reg'l Med. Ctr.*, 536 F.3d 757, 763 (7th Cir. 2008) (although formation of a contract alone cannot confer personal jurisdiction, a contract that created continuing obligations for a period of months was sufficient to do so); *Zep, Inc. v. First Aid Corp.*, No. 09 CV 1973, 2010 WL 1195094, at *2 (N.D. Ill. Mar. 19, 2010) (observing that suits against former employees for breach of restrictive covenants are typically filed in the employer's home state, "where continuing obligations are owed"); *Prod. Grp. Int'l, Inc. v. Goldman*, 337 F. Supp. 2d 788, 798 (E.D. Va. 2004) (a defendant sued in Virginia "created 'continuing obligations' between himself and forum residents by accepting employment with a Virginia-based company").

Based on the foregoing, W. Capra has made out a *prima facie* showing that Snyder purposefully availed himself of the privilege of doing business in Illinois. *See Burger King*, 471 U.S. at 475, 105 S. Ct. at 2183–84; *Tamburo*, 601 F.3d at 702; *GCIU–Emp'r Ret. Fund*, 565 F.3d at 1023; *Purdue*, 338 F.3d at 782. Additionally, as Snyder's contacts with Illinois arise out of the employment agreement that lies at the heart of W. Capra's claim, W. Capra has established that its injury "arise[s] out of" or "relate[s] to" Snyder's contacts. *Tamburo*, 601 F.3d at 708 (quoting *Burger King*, 471 U.S. at 472, 105 S. Ct at 2182)); *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997) ("[I]n a breach of contract case, it is only the dealings *between the parties in regard to the disputed contract* that are relevant to minimum contacts analysis." (quotations omitted)). Accordingly, W. Capra has carried its burden to show that Snyder formed the minimum contacts necessary to render personal jurisdiction in Illinois proper.

## 2. Traditional Notions of Fair Play and Substantial Justice

Beyond minimum contacts, personal jurisdiction over Snyder in Illinois must "not offend traditional notions of fair play and substantial justice." *Tamburo*, 601 F.3d at 701 (quoting *Int'l*

*Shoe Co.*, 326 U.S. at 316, 66 S. Ct. at 158).  Relevant considerations in this analysis include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King*, 471 U.S. at 477, 105 S. Ct. at 2185 (internal quotation marks omitted).  A defendant who has directed his activities at the forum state, as here, must make a "compelling case" that these or other factors make jurisdiction unreasonable; "[m]ost such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional." *Id.*

Snyder does not argue that any of the above factors should weigh on our analysis of personal jurisdiction, focusing instead almost exclusively on his purported lack of minimum contacts with Illinois.  Snyder thus fails to make a "compelling case" that jurisdiction in Illinois would be fundamentally unfair. *Id.*  Likewise, we conclude that it would not be unfair for Snyder to defend a breach of contract action in the home state of his former employer, with whom he had repeated and sustained contact during his employment. *Tamburo*, 601 F.3d at 701; *A & R Logistics Holdings, Inc. v. Curl*, No. 15 C 7106, 2015 WL 5561179, at *3 (N.D. Ill. Sept. 21, 2015) (it is not fundamentally unfair to "require[e] an employee who . . . had frequent and substantial contact with his out-of-state employer to be subject to the jurisdiction of courts in his employer's home state").

*          *          *

For the foregoing reasons, we deny Snyder's motion to dismiss for lack of personal jurisdiction.

## II. TRO AND PRELIMINARY INJUNCTION

We turn now to W. Capra's motion for TRO and preliminary injunction to enforce the restrictive covenant in Snyder's employment agreement. For the reasons that follow, we grant W. Capra's motion.

### A.     LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy . . . that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion."[3] *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 1867 (1997)) (emphasis in original) (internal alteration omitted). We engage in a two-step analysis to determine if preliminary relief is warranted. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). First, we determine if the movant has a made a threshold showing "that it has some likelihood of success on the merits; that it has no adequate remedy at law; [and] that without relief it will suffer irreparable harm." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019) (quotation omitted). "If the [movant] fails to meet any of these threshold requirements, the court 'must deny the injunction.'" *Id.* (quoting *Girl Scouts*, 549 F.3d at 1086). If, however, the movant meets the threshold requirements, we must "weigh[] the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086; *see also Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). "This Circuit employs a

---

[3] The standards for granting a temporary restraining order and preliminary injunction are the same. *Gray v. Orr*, 4 F. Supp. 3d 984, 989 n.2 (N.D. Ill. 2013); *Long v. Bd. of Educ., Dist. 128*, 167 F. Supp. 2d 988, 990 (N.D. Ill. 2001); *Crue v. Aiken*, 137 F. Supp. 2d 1076, 1082 (C.D. Ill. 2001).

sliding scale approach for this balancing: if a [movant] is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a [movant] is to win the more that balance would need to weigh in its favor." *GEFT Outdoors, LLC*, 922 F.3d at 364 (quotation omitted). Finally, we "must also consider the public interest in granting or denying an injunction." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 678 (7th Cir. 2012).

## B.  ANALYSIS

### 1.  Likelihood of Success on the Merits

W. Capra contends Snyder is in violation of the express terms of the non-competition provision he signed with W. Capra, which was designed to prevent him from gaining training and experience with McAfee products and then immediately leaving to perform the same work for McAfee directly.  (Pl.'s Mem. in Supp. of Mot. for TRO and Prelim. Inj. ("Mem.") (Dkt. No. 6) at  1.)  Snyder challenges the enforceability of the non-competition provision because W. Capra has not adequately demonstrated that it is necessary to protect W. Capra's legitimate business interests or that W. Capra's relationship with McAfee is harmed by Snyder's new position.  (Resp. (Dkt. No. 14) at 6.)  Snyder also argues that his employment with McAfee does not violate the employment agreement because McAfee is not actually W. Capra's customer, and because his new position is sufficiently different from his former position with W. Capra to render the non-competition provision inapplicable.  (*Id.* at 5–6.)

### a.  Choice of Law

As a federal court sitting in diversity jurisdiction, we apply the substantive law of the state in which we sit: here, Illinois.  *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015) (citing *Hanna v. Plumer,* 380 U.S. 460, 465, 85 S. Ct. 1136, 1141 (1965)).  A preliminary matter is what law Illinois would choose to apply to the parties' employment agreement.  W. Capra presented its arguments for a TRO and preliminary injunction under both

Illinois and Florida law, which W. Capra asserts both warrant relief. (*See* Mem. at 5 n.2.) Snyder argues only under the Illinois standard, and does not make any argument as to Florida law. (Resp.) In Illinois, "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome. The party seeking the choice-of-law determination bears the burden of demonstrating a conflict, *i.e.*, that there exists a difference in the law that will make a difference in the outcome." *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 2014 IL 116389, ¶ 14, 10 N.E.3d 902, 905 (Ill. 2014) (quotations and citations omitted). As no party has demonstrated a conflict and Snyder does not advocate for Florida law, we analyze the employment agreement under Illinois law.

### b. Threshold Enforceability of Non-competition Covenant

The enforceability of a restrictive covenant in Illinois is a question of law and "depends on the reasonableness of its terms." *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 85, 866 N.E.2d 85, 104 (Ill. 2006); *accord McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1051, 486 N.E.2d 1306, 1311 (1st Dist. 1985). Prior to determining its reasonableness, however, the Court must determine "(1) whether the restrictive covenant is ancillary to a valid contract; and (2) whether the restrictive covenant is supported by adequate consideration." *Allied Waste Servs. of N. Am., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016) (citing *Fifield v. Premier Dealer Servs., Inc.*, 2013 IL App (1st) 120327, ¶ 13, 993 N.E.2d 938, 942 (1st Dist. 2013)).

A non-compete covenant entered into as part of an at-will employment agreement satisfies the ancillarity prong. *Arthur J. Gallagher & Co. v. Roi*, 2015 IL App (1st) 140786-U, ¶ 46 (1st Dist. 2015); *Lawrence & Allen, Inc. v. Cambridge Human Res. Grp., Inc.*, 292 Ill. App. 3d 131, 137, 685 N.E.2d 434, 440 (2d Dist. 1997). As Snyder's employment with W. Capra was at-will, his non-competition agreement was ancillary to his employment with

W. Capra.  (Employment Agreement at 4 (informing Snyder that his "employment with
W. Capra will be on an 'at-will' basis").)

As for adequate consideration, Snyder was employed by W. Capra for approximately
18 months before he voluntarily resigned to join McAfee.  (Snyder Aff. ¶¶ 8–9.)  In addition, the
covenant was supported by a $1,000 signing bonus.  (Employment Agreement at 3.)  On its own,
continued employment for 18 months, combined with voluntary resignation, has been enough for
courts to find restrictive covenants to be supported by adequate consideration.  *Avison Young-
Chi., LLC v. Puritz*, No. 17 C 0844, 2017 WL 5896887, at *6 (N.D. Ill. Nov. 29, 2017)
("Defendants' employment for approximately 17 months and their subsequent voluntary
resignation" was enough for adequate consideration under Illinois law); *see also Montel
Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 716 (N.D. Ill. 2014) (finding 15 months'
employment plus voluntary resignation to be adequate consideration).  Snyder's 18-month
employment with W. Capra and voluntary resignation, plus the explicit consideration of $1,000
to agree to the non-competition covenant, thus likely satisfies the consideration prong.

### c.  Reasonableness of Non-competition Covenant

We now turn to whether Snyder's non-competition covenant would be considered
reasonable, and thus enforceable, under Illinois law.  "A restrictive covenant . . . is reasonable
only if the covenant: (1) is no greater than is required for the protection of a legitimate business
interest of the employer-promisee; (2) does not impose undue hardship on the employee-
promisor, and (3) is not injurious to the public."  *Reliable Fire Equip. Co. v. Arredondo*,
2011 IL 111871, ¶ 17, 965 N.E.2d 393, 396 (Ill. 2011).  Whether a restrictive employment
covenant protects legitimate business interests is determined by the totality of the circumstances.
*Id.* ¶ 43, 965 N.E.2d at 403.  "No factor carries any more weight than any other, but rather its
importance will depend on the specific facts and circumstances of the individual case."  *Id.*  The

non-competition clause in Snyder's contract prevents Snyder from providing "McAfee Corporation product consulting" to any customer Snyder worked with on behalf of W. Capra in the 12 months preceding the end of his employment. (Employment Agreement at 3.) W. Capra argues that "preventing Snyder from harming W. Capra's substantial relationships with its customers," particularly McAfee, is a legitimate business interest protected by this restrictive covenant. (Mem. at 10.)

Preserving near-permanent customer relationships is one relevant factor in identifying a legitimate business interest. *Reliable Fire*, 2011 IL 111871 at ¶ 11, 965 N.E.2d at 396. While, Snyder argues that "nothing in W.Capra's motion or in its memorandum and claimed supporting documents . . . establishes any type of permanent customer relationship . . . with McAfee," (Def.'s Resp. at 6), W. Capra's relationship with McAfee, at least in the context of Snyder's former position, can be considered near-permanent.

Whether a client is near-permanent "turns in large degree on the nature of the business involved, and certain businesses are just more amenable to success under" that theory. *Office Mates 5, N. Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 571, 599 N.E.2d 1072, 1081 (1st Dist. 1992). Among those are businesses "who sell their customers a unique product or service," *id.* (citing *A.B. Dick Co. v. Am. Pro-Tech*, 159 Ill. App. 3d 786, 514 N.E.2d 45 (1st Dist. 1987) (providing repair and maintenance services for copiers, microfiche and offset printing equipment), and *McRand*, 138 Ill. App. 3d 1045, 486 N.E.2d 1306 (designing and facilitating management and incentive award programs for corporations and businesses)); and those "under contract with customers." *Id.*, 599 N.E.2d at 1082 (citing *A.B. Dick Co.*, 159 Ill. App. 3d 786, 514 N.E.2d 45 (customers under one-year contract with automatic renewal), and *J.D. Marshall Int'l v. Fradkin*, 87 Ill. App. 3d 118, 409 N.E.2d 4 (1st Dist. 1980) (contract to be exclusive exporter for domestic manufacturers)).

Under these parameters, McAfee likely counts as a near-permanent customer of W. Capra. W. Capra provides a unique service to McAfee by having a "highly specialized team dedicated to providing" McAfee-specific consulting services to McAfee's end-users. (Verified Compl. ¶ 6). McAfee provided these services under a contract with W. Capra that entailed farming out Snyder, a W. Capra employee, to McAfee's consumers, one of which is called LifePoint. (*Id.* ¶¶ 7, 13.) W. Capra thus sells McAfee a unique service in an ongoing relationship defined by contract, qualifying McAfee as a near-permanent customer of W. Capra under Illinois law. *See Hazen*, 234 Ill. App. 3d at 571, 599 N.E.2d at 1081.

Time and place restrictions also factor into determining whether a restrictive covenant reasonably protects legitimate business interests. *Reliable Fire*, 2011 IL 111871 at ¶ 43, 965 N.E.2d at 403. The non-compete clause in Snyder's contract lasts only for one year, which Illinois courts have found to be reasonable. *See Mohanty*, 225 Ill. 2d at 78, 866 N.E.2d at 100 (upholding three- and five-year restrictive employment covenants); *Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys., LLC*, No. 02 C 5403, 2003 WL 1057929, at *20 (N.D. Ill. Mar. 10, 2003), *aff'd sub nom. Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706 (7th Cir. 2005) (stating "[n]on-compete agreements lasting for one year (or even more) have been upheld" in Illinois and listing Illinois Supreme Court cases). And while not limited by geography, Snyder's non-compete is limited in scope: it prevents Snyder from working for W. Capra customers to whom Snyder himself provided services during his last year of employment. (Employment Agreement at 3.) "Covenants containing no geographic limitation have been upheld as reasonable where the purpose of the restriction was to protect the employer from losing customers to a former employee who, by virtue of his employment, gained special knowledge and familiarity with the customers' requirements." *Eichmann v. Nat'l Hosp. & Health Care Servs., Inc.*, 308 Ill. App. 3d 337, 344, 719 N.E.2d 1141, 1147 (1st Dist. 1999);

*see also McRand*, 138 Ill. App. 3d at 1057, 486 N.E.2d at 1315 ("Illinois courts have found covenants containing no geographic limitation to be valid if their purpose is to protect an employer from losing clients to a former employee who gains special knowledge of the client's needs while employed.").  Despite the non-compete clause, Snyder remains free to work for a direct competitor of W. Capra, for a W. Capra client to whom Snyder did not actively provide service within a year of his departure, or even for McAfee itself so long as his job does not entail "McAfee Corporation product consulting and/or vulnerability/penetration services."  (*Id.*; *see also* Reply (Dkt. No. 19) at 1 ("Snyder could work for virtually any company (including direct competitors) *except McAfee*" under the agreement).)

In sum, the circumstances of Snyder's restrictive covenant lead us to conclude, at least on this limited record, that it is narrowly tailored to protect W. Capra's legitimate business interest in preserving its ongoing relationship with McAfee. *Reliable Fire*, 2011 IL 111871 at ¶ 17, 965 N.E.2d at 396.  Likewise, the limited scope and timeframe of Snyder's non-compete clause seems neither to impose undue hardship on Snyder nor to be injurious to the public. *Id.*; *see McRand*, 138 Ill. App. 3d at 1057, 486 N.E.2d at 1315 (finding no undue hardship from restrictive covenant that only prevented defendants from selling to certain customers of the plaintiff); *Wessel Co. v. Busa*, 28 Ill. App. 3d 686, 691, 329 N.E.2d 414, 417–18 (1st Dist. 1975) (finding three-year restrictive covenant limiting business with plaintiff's customers (1) not injurious to the public because enforcing the covenant would not prevent the public or plaintiff's competitors from doing business, and (2) not unduly hard on defendant, who was free to engage in business with those who were not plaintiff's customers).  For all these reasons, we conclude at this stage that the restrictive covenant in Snyder's employment agreement is reasonable and likely enforceable under Illinois law.

#### d. Applicability of Restrictive Covenant to Snyder

Even if the non-competition clause is enforceable, Snyder argues that it does not apply to him. Snyder's arguments require us to interpret the contract. Contract construction is a question of law to be determined by a court. *Gallagher v. Lenart*, 226 Ill. 2d 208, 219, 874 N.E.2d 43, 50 (Ill. 2007). Contracts must be construed to give effect to the intention of the parties, and contract language that is clear on its face must be given its plain and ordinary meaning. *Id.* at 232, 874 N.E.2d at 58. "[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* at 233, 874 N.E.2d at 58. Contract language that is susceptible to more than one reasonable interpretation is ambiguous. *Id.* However, "a court will not search for ambiguity where there is none." *Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 223 Ill. 2d 352, 362–63, 860 N.E.2d 307, 314 (Ill. 2006) (interpreting insurance contract "[l]ike any contract").

Snyder first asserts that McAfee is not a "customer or other entity" for which he provided services on behalf of W. Capra. (Resp. at 5–6; Employment Agreement at 3.) This argument fails, for we have already determined that McAfee was likely a near-permanent customer of W. Capra based on the limited record before us. Capra entered into a contract with McAfee whereby McAfee pays W. Capra to provide security consulting personnel to McAfee's end-users. (Stavropoulos Suppl. Decl. ¶ 5; Reply at 2.) One such contract with McAfee was a statement of work by which McAfee would pay W. Capra to provide a security consultant— Snyder—to work for LifePoint, one of McAfee's end-users. (Stavropoulos TRO Decl. ¶¶ 4, 11; Stavropoulos Suppl. TRO Decl. ¶ 6; Reply at 2–3.) McAfee was clearly a "customer" of W. Capra. *See* Merriam Webster's Collegiate Dictionary (10th ed. 1996) (defining "customer" as "one that purchases a commodity or service"). Although Snyder contends he "never rendered services to McAfee while he was employed by W. Capra," (Resp. at 6), McAfee paid W. Capra

to provide consulting services to LifePoint, and Snyder thus worked on behalf of W. Capra for its customer, McAfee, regardless of whether Snyder was party to the companies' agreement.

Second, Snyder argues that his position at McAfee does not violate the covenant because McAfee has made him responsible for pre-sale activities, whereas his work at W. Capra was exclusively post-sale. (Resp. at 5.) This argument also fails. The restrictive covenant proscribes Snyder's ability, for one year, to "provide security consulting services, including but not limited to McAfee Corporation product consulting and/or vulnerability/penetration services" to W. Capra customers. (Employment Agreement at 3.) "Consulting" is defined as "providing professional or expert advice," and in the professional context, "service" is defined as "useful labor that does not produce a tangible commodity." Merriam Webster's Collegiate Dictionary (10th ed. 1996).

In the context of Snyder's restrictive covenant, "McAfee Corporation product consulting" would include providing professional or expert advice on McAfee products. Based on the McAfee Security Sales Engineer job description provided by Snyder, (Snyder Aff. at 9–11), he is responsible for doing just that. His duties at McAfee include "[p]rovid[ing] exemplary technical expertise on customer product and solution demonstrations"; "deliver[ing] a comprehensive consultative response" to requests for proposals; and "[p]resent[ing] a solution proposal to the customer, demonstrate[ing] how we [McAfee] solve the customer's requirements and how this aligns with the customers' outcomes and differentiate from the competition." (*Id.*) The restrictive covenant simply proscribes the provision of "consulting services;" it makes no distinction between pre- and post-sale consulting. (Employment Agreement at 3.) And even if it did, it appears from the job description that Snyder's duties may also include post-sale McAfee product consulting. (Snyder Aff. at 9 ("When required, lead the proof of concept from

engagement, ownership of all activities and orchestration, through to completion").)[4]  In

addition, W. Capra has provided a detailed chart that indicates significant overlap between his

former position with W. Capra and his new one with McAfee.  (Stavropoulos Suppl.

TRO Decl. ¶ 11.)

In short, Snyder did the one thing he expressly agreed not to do for a period of one year:

immediately parlay his McAfee-centric position with W. Capra into a similar position with

McAfee proper.  Snyder's new employment fits squarely into the limited activity proscribed by

his employment agreement with W. Capra.  Based on the foregoing, W. Capra has passed the

"admittedly low" threshold of success on the merits necessary to warrant a TRO and preliminary

injunction.  *Girl Scouts*, 549 F. 3d at 1096.

## 2.        Irreparable Harm and Inadequacy of Damages

In addition to likelihood of success on the merits, W. Capra must also demonstrate that

damages would be inadequate to remedy any harm that flowed from nonenforcement of Snyder's

restrictive covenant and that it would suffer irreparable harm during the pendency of its claim

without the entry of a TRO or preliminary injunction.  *Girl Scouts*, 549 F.3d at 1086.  "[H]arm is

'irreparable' if it 'cannot be prevented or fully rectified by the final judgment after trial.'"

*Id.* at 1089 (quoting *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386

(7th Cir. 1984)).  The harm cited by a movant "must . . . be likely," meaning "there must be more

than a mere possibility that the harm will come to pass."  *U.S. Army Corps of Eng'rs*,

667 F.3d 765, 788 (7th Cir. 2011).  However, "the alleged harm need not be occurring or be

certain to occur before a court may grant relief."  *Id.*  A remedy at law is inadequate if damages

---

[4] Conversely, W. Capra has submitted material suggesting that Snyder's duties while at
W. Capra included selling McAfee products at LifePoint (Stavropoulos Suppl. Decl. ¶ 12),
belying the notion that Snyder's duties at W. Capra were strictly post-sale.

would "be seriously deficient as a remedy for the harm suffered." *Roland Mach.*, 749 F.2d at 386. Such a deficiency may be present if, among other reasons, "[t]he nature of the plaintiff's loss . . . make[s] damages very difficult to calculate," as in the loss of future business profits. *Id.*

W. Capra asserts it suffers irreparable harm from its diminished customer relationship with McAfee and that damages would be inadequate to redress its uncertain amount of future lost business. (Mem. at 6–8.) W. Capra submits that after Snyder went to work for McAfee, McAfee canceled a statement of work with W. Capra to provide nearly identical product consulting services to the same McAfee end-user, LifePoint. (Stavropoulos TRO Decl. ¶ 16.) The statement of work had about $147,000 of outstanding service left to be performed when W. Capra filed its motion for TRO and preliminary injunction. (*Id.*) Since then, W. Capra reports that it is working to save the LifePoint contract with McAfee. (Stavropoulos Suppl. TRO Decl. ¶ 7.) Whether or not that is possible, W. Capra claims that Snyder's new position poses an ongoing threat to that portion of W. Capra's business that provides McAfee consulting services. (*Id.* ("Services that McAfee would contract out to W. Capra can now be assigned internally to Snyder.").)

W. Capra has shown irreparable harm. The very fact that its relationship with McAfee over the LifePoint contract has been threatened is enough to show that there is "more than a mere possibility that . . . harm will come to pass." *U.S. Army Corps of Eng'rs*, 667 F.3d at 788. It matters not that W. Capra may be able to salvage its relationship with McAfee over this one contract. *Id.* ("[T]he alleged harm need not be occurring or be certain to occur before a court may grant relief."). A segment of W. Capra's business model comprises a "highly specialized team dedicated to providing" consulting services to McAfee users on McAfee products. (Verified Compl. ¶ 6.) McAfee itself engages W. Capra to provide these services. (*Id.* ¶¶ 6–7.)

In the overall relationship between W. Capra and McAfee, it is reasonably likely that it would be difficult or impossible to measure damages resulting from McAfee assigning work to Snyder in the future that would have gone to W. Capra in the past. "The injuries that flow from the violation of a non-compete are difficult to prove and quantify," making such injury "a canonical form of irreparable harm" and "restrictive covenants prime candidates for injunctive relief." *Turnell*, 796 F.3d at 666–67; *see also Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005) (in violations of restrictive covenants, "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable'").

For the same reason, damages are an inadequate remedy for W. Capra's asserted harm. Snyder argues that, because W. Capra claims damages from Snyder's breach in the ad damnum clause of its complaint, W. Capra has an adequate remedy at law, and its harm is not irreparable. (Resp. at 6–9.) However, just because W. Capra claims damages does not mean that those damages will be easy or even possible to calculate. Business that McAfee no longer brings to W. Capra in the future may be unknowable. "A damages remedy can be inadequate" if "[t]he nature of the plaintiff's loss may make damages very difficult to calculate." *Roland Mach.*, 749 F.2d at 386. W. Capra's potential damages fit this definition.

Accordingly, we conclude W. Capra has shown both irreparable harm and the inadequacy of damages.

### 3.     Balancing of Harms and Public Interest

We must now balance W. Capra's harms if an injunction were not granted against the harm Snyder would suffer if an injunction were granted. *Girl Scouts*, 549 F.3d at 1086. This balancing is assessed on a sliding scale, whereby the more likely W. Capra is to succeed on the merits, the less heavily the balance needs to weigh in its favor. *GEFT Outdoors, LLC*, 922 F.3d at 364. This inquiry is designed, in part, to minimize the potential cost of a different

result on the merits to the losing party at this preliminary stage. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992). We must also consider the public interest in granting or denying an injunction. *Stuller, Inc.*, 695 F.3d at 678.

W. Capra argues that it suffers the greater injury because Snyder's new position harms W. Capra's business relationship with McAfee. (Mem. at 12.) McAfee has already called into question a W. Capra work order that Snyder could now handle internally at McAfee. (*Id*.) The remaining value of that work order when this suit was filed stood at about $147,000. (Verified Compl. ¶ 15.)

Snyder, for his part, claims that he is the sole provider for his family and that the loss of his current job at McAfee will render him unable to pay mortgage, food, or clothing bills. (Snyder Aff. ¶ 4.) Snyder does not specifically identify his potential monetary loss. While we do not know his annual compensation at McAfee, his employment agreement with W. Capra pegged his annual salary at $135,000 plus performance-based bonuses. (Employment Agreement at 2.)

We find that the balance weighs in W. Capra's favor. Our conclusion is guided by W. Capra's strong case for ultimate success on the merits. As discussed above, the restrictive covenant in Snyder's employment agreement is likely enforceable under Illinois law and would apply to Snyder's new position at McAfee. The non-competition clause W. Capra seeks to enforce is limited. Enforcing it in this instance will not bar Snyder from the security software consulting or services business. It will simply bar him, for one year, from performing tasks at McAfee that are substantially similar to those he performed at W. Capra. Should McAfee not be able to accommodate this order, Snyder would be prohibited from seeking employment from the specific McAfee end-users to whom Snyder provided service for W. Capra in the last year. (Employment Agreement at 3.) According to Snyder himself, enforcement would bar him from

seeking similar employment at approximately three companies besides McAfee. (Snyder Aff. ¶ 16 (naming Community Health Systems, Visteon, and LifePoint as entities he served while at W. Capra).) Although we have no other information regarding the size of the McAfee end-user market or general computer security systems market, we doubt that Snyder's alternative employment options will be severely limited by enforcing the restrictive covenant. And, on the whole, Snyder's eventual harm would be reparable, in the form of back-pay, while we have already determined that W. Capra's would be irreparable. *See Turnell*, 796 F.3d at 666–67 (balancing the recoverable damages to a wrongfully enjoined employee against the "canonical form of irreparable harm" faced by the injury to his former company from breach of a non-compete clause).

Moreover, Snyder appears to have entered McAfee's employ with open eyes. The letter he submitted from McAfee's internal employment counsel stated that when McAfee became aware of his non-competition agreement with W. Capra, they advised Snyder to seek outside counsel "to further aide in your ultimate decision to accept any risk that may ensue should you decide to move forward and become a McAfee employee." (Snyder Aff. at 13.) In addition, McAfee's counsel told Snyder that "any litigation that may ensue as a result of your knowledgeable breach of the Employment agreement with W[.] Capra would be a 'personal issue' that you would need to handle with your outside counsel." (*Id.*) Snyder plainly knew when he took the job with McAfee that his prior agreement with W. Capra could potentially place his new employment in jeopardy.

Finally, the public interest would not be harmed by an injunction to enforce the restrictive covenant. The foregoing analysis demonstrates that the restrictive covenant here conforms to Illinois courts' concern that such agreements be reasonable and not "injurious to the public." *Reliable Fire*, 2011 IL 111871 at ¶ 17, 965 N.E.2d at 396. As in Illinois cases upholding similar

provisions, enforcing Snyder's restriction would not deprive the public of unique skills or services that only Snyder can provide, nor is there any evidence before us that enforcement would allow W. Capra to unduly corner the market on McAfee security consulting services. *See McRand*, 138 Ill. App. 3d at 1057, 486 N.E.2d at 1314–15 ("no evidence of injury to the public" by enforcing restrictive covenant in "highly competitive" field and where other companies provide similar services to consumers); *Shorr Paper Prod., Inc. v. Frary*, 74 Ill. App. 3d 498, 506–07, 392 N.E.2d 1148, 1154 (1979) ("the public would not be forced into dealing solely with plaintiff in order to obtain such goods and services as plaintiff provides" in enforcing restrictive covenant in competitive market).

We therefore find that the balance of harms and public interest considerations weigh in W. Capra's favor and warrant granting a temporary restraining order and preliminary injunction against Snyder.

### C.    BOND

Because W. Capra is entitled to preliminary relief, we must consider the appropriate security that it should be required to post. Pursuant to Federal Rule of Civil Procedure 65(c), we may "issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party [later] found to have been wrongfully enjoined or restrained." *See also Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (2002) ("The purpose of an injunction bond is to compensate the defendant, in the event he prevails on the merits."). "The appropriate amount of the bond is subject to the court's discretion." *Monster Energy Co. v. Wensheng*, 136 F. Supp. 3d 897, 910 (N.D. Ill. 2015) (citing Fed. R. Civ. P. 65(c); *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994)). However, the Seventh Circuit cautions us to "err on the

high side" because "the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000).

As discussed, we do not know precisely how much Snyder stands to lose from enforcement of the restrictive covenant. However, his former employment with W. Capra entailed $135,000 annual base salary plus performance-based compensation. (Employment Agreement at 2.) The bond should reasonably cover any potential damages for one year of employment, the time frame established by the restrictive covenant. We therefore find an appropriate bond in this case is $202,500, or half again as much as Snyder's former annual base salary at W. Capra.

## CONCLUSION

For the foregoing reasons, we deny Snyder's motion to dismiss for lack of personal jurisdiction, (Dkt. No. 16), and we grant W. Capra's motion for a temporary restraining order and preliminary injunction against Snyder. (Dkt. No. 5.) Quinton Snyder is preliminarily enjoined as follows:

1) Snyder shall not, directly or indirectly, on behalf of himself or any other entity, either as an employee, contractor, or agent, provide McAfee, LLC product consulting and/or vulnerability/penetration services, to McAfee, LLC, or to any other customer of W. Capra or any other entity for which he, on behalf of W. Capra, provided these services from June 14, 2018 to June 14, 2019.

2) Should Snyder remain employed by McAfee, LLC, he shall not perform those functions as a McAfee Sales Engineer that are substantially similar to those he performed as a W. Capra Senior Security Engineer, (*see* Stavropoulos Suppl. TRO Decl. ¶ 11), attached to this order as Exhibit A.

3) Provisions (1) and (2) shall remain in effect until the earlier of a decision on the merits, at which time the Court will issue a final order that supersedes this injunction, or one year from the date of this order.

In addition, W. Capra shall post a security in the amount of $202,500 within ten days of this order.  It is so ordered.

_____
Honorable Marvin E. Aspen
United States District Judge

Dated:  August 20, 2019
         Chicago, Illinois

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

W. CAPRA CONSULTING GROUP, INC.  )
                                    )
      Plaintiff,               )
                                    )     No. 1:19 C 4188
      v.                      )     Hon. Marvin E. Aspen
                                    )
QUINTON SNYDER,           )
                                    )
      Defendant.           )

## EXHIBIT A

In accordance with provision (2) of this Court's preliminary injunction order, Quinton Snyder shall not perform the following functions as a McAfee Sales Engineer that are substantially similar to his former position as a W. Capra Senior Security Engineer:

- Own the solution sales activities within the sales process to gain the technical win and the customers' trust

- Participate in solution led sales calls and prospect visits, qualifying the customer's requirements

- Gather requirements, develop use cases, and fully understand the client's business needs and constraints

- Be able to present the "Threat Defense Lifecycle" and how this solves the customer's needs and outcomes

- Provide exemplary technical expertise on customer product and solution demonstrations

- Ownership of the technical or solution response to RFIs/RFPs and orchestration of the virtual teams to help deliver a comprehensive consultative response

- Present a solution proposal to the customer, demonstrate how we solve the customer's requirements and how this aligns with the customers' outcomes and differentiate from the competition

- When required, lead the proof of concept from engagement, ownership of all activities and orchestration, through to completion

- Play a pro-active "Technical Account Management" role within your target accounts including building a trusted relationship, monitoring/managing customer issues in partnership with support, expand the existing footprint and drive competitive displacements

- Technical account lead for Customer Executive Briefing events

(*See* Snyder Aff. (Dkt. No. 14–1) at 9; Stavropoulos Suppl. TRO Decl. (Dkt. No. 19–1) ¶ 11.)